## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| NATHAN WICKSMAN, *individually and on behalf of all others similarly situated*, ) ) ) | |
| ) | **Case No.** 1:15-cv-13559 |
| Plaintiff, ) | |
| v. ) | |
| ) | **Jury Trial Demanded** |
| DRAFTKINGS, INC. ) | |
| ) | |
| Defendant. ) | |
| ) | |

_____)

### CLASS ACTION COMPLAINT

### INTRODUCTION

1.      DraftKings hosts online fantasy sports contests. Participants ("Players") pay fees to DraftKings to enter the contests, in which they assemble rosters of athletes and pit their respective "teams" against each other in the hope of winning money. DraftKings recruits Players through a barrage of ubiquitous video, Internet, and print advertisements – it bought more than $23 million worth of television ads in the first week of the NFL season. DraftKings' incessant recruitment of new players is critical to its business model. This class action challenges the deceptive nature of one aspect of that recruitment effort – the false promise that DraftKings will match new Players' initial account deposits up to $600.

2.      To begin entering contests, Players must set up an account and deposit funds. DraftKings' website promises that Players who sign up "today" will receive an exclusive, limited-time 100% deposit match. For example, DraftKings represents that when a new Player deposits $600 in a DraftKings' account, DraftKings' promised deposit match of an additional $600 "will already be available to you." *See* https://www.youtube.com/watch?v=OTH-OquOmFk, last accessed October 9, 2015. DraftKings promises that when the Player signs up, he (Players are overwhelmingly male) will "automatically get" the additional matching deposit. *Id.*

3.      But the new Player who deposits $600 expecting to have $1,200 immediately "available" learns only after the fact that the deposit match, like the games, is fantasy. The only way to actually get the "free" deposit match is to pay thousands more in entry fees to play contests. By entering contests, Players earn points through an almost inscrutable process by which points are converted to dollars and subsequently "released" to the Player at rates ranging from 2% to 4% of the fees paid. A Player depositing $600 would have to pay at least $15,000 in entry fees to realize the promised $600 deposit match. And DraftKings requires the new Player to spend that additional $15,000 *within four months* of putting down that first $600, a nearly impossible hurdle.

4.      As designed, DraftKings' promise of a deposit match that will "already be available to you" upon registration as a new Player is a blatant deception, and its undisclosed condition requiring Players to spend at least 25

times their initial deposit within four months to realize the 100% match

DraftKings promises makes it virtually impossible for the Player to do so.

5.      This class action seeks declaratory, injunctive and monetary relief

on behalf of all Players victimized by DraftKings' cynical and deceptive business

practices.

## PARTIES

6.      Nathan Wicksman is an adult residing in Suffolk County,

Massachusetts.

7.      DraftKings, Inc., is a Delaware corporation with its principal place

of business at 125 Summer St., 5th Floor, Boston, Massachusetts.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to the Class

Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the proposed Class

consists of 100 or more members, the amount in controversy exceeds $5,000,000,

exclusive of costs and interest, and minimal diversity exists.

9.      Venue is appropriate in this district under 28 U.S.C. § 1391 because

DraftKings' principal place of business is Boston, Massachusetts, a substantial

portion of the events giving rise to the claims occurred here, and DraftKings

chose this venue in its contract with Mr. Wicksman.

## DRAFTKINGS' DECEPTIVE MARKETING SCHEME

10.      Online fantasy sports contests are a multibillion dollar industry.

DraftKings and FanDuel are the two behemoths of the industry, each is valued at

more than $1 billion, and has more than two million registered Players, respectively.

11.     Although DraftKings' ads promote the idea that any regular Joe can earn big money, millions even, participating in these fantasy contests, the truth is that DraftKings allows a small cadre of elite Players to capture the vast bulk of the prize money over the course of a season. These "whales" use sophisticated statistical modeling and computer algorithms which automate the contest entry process, allowing them to manage hundreds of entries at once and identify the weakest opponents.

12.     The result is predictable. According to a study of the industry by *Sport Business Journal*, in the first half of the 2015 MLB season at least 85 percent of the Players lost money. http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx. In contrast, approaching a betting window in Las Vegas and choosing a team at random still yields a return almost 50% of the time. And disgruntled new Players who consistently lose, and realize that their promised deposit match is illusory, tend not to continue playing.

**DRAFTKINGS' DECEPTIVE DEPOSIT MATCHING PROMISES**

13.     To keep drawing in new Players, DraftKings advertises ubiquitously, and induces new Players to put down, $100, $200, $600 deposits by its deceptive deposit matching inducement. In fact, according to *The Wall Street Journal*, it was at one point the single biggest advertiser on television.

http://blogs.wsj.com/cmo/2015/09/16/are-draftkings-and-fanduel-bombarding-fans-with-too-many-ads/.

14.     The start of the NFL season in September has made that month the sweet spot for Player recruitment. DraftKings collected roughly $30 million in entry fees in the first week of the NFL season alone, according to *Bloomberg Business*. http://www.bloomberg.com/news/articles/2015-09-10/you-aren-t-good-enough-to-win-money-playing-daily-fantasy-football. This is as much as all of the sports books in Las Vegas combined in the same time frame.

15.     New visitors to DraftKings' official website begin on a page that offers free entry to a fantasy football contest in which Players can "Win Real Cash!" and promises "PLUS deposit now and we'll double your cash!"



(Last accessed October 9, 2015, https://www.draftkings.com)

16.     Other DraftKings' webpages offer similar unconditional promises on the first page, like promising that the prospective Player can "Redeem My $600 Deposit Bonus," boldly displayed on a large red button.



(Last accessed October 9, 2015, http://www.playdraftkings.com)

**DRAFTKINGS USES A FALSE SENSE OF URGENCY TO INDUCE PLAYERS TO SIGN UP BEFORE THEIR DEPOSIT BONUS WINDOW CLOSES**

17.     If a Player clicks on the Play Now button of the official website, a Sign Up window appears in which he can create a Player name and password. Once a password and username is created, Players are taken to a deposit page, as displayed below, which again promises in large type: "Deposit now and we'll **DOUBLE YOUR CASH** up to $600! Get started now!" (Emphasis in original.) The doubling offer is presented as a "limited time offer," the urgency of

which is reinforced by the image of a 10 minute countdown "clock" that ticks

down the seconds until it supposedly expires.



(Last accessed October 9, 2015,

[https://www.draftkings.com/account/depositnewvisitorinterstitial](https://www.draftkings.com/account/depositnewvisitorinterstitial))

18.     The deposit page contains four large boxes from which Players can

choose how much to deposit—$25, $100, $250, or $600. Below these dollar

amounts appear the corresponding "matching" amounts—"$25 Free Bonus,"

"$100 Free Bonus," "$250 Free Bonus," or "$600 Free Bonus," respectively.

19.     Players, rushed by DraftKings to enter their information before the

clock runs out, would have to scroll down to the asterisked footnote in small

print at the bottom of the page to find the following explanation: "Deposit bonus

funds are not available immediately, but are released into your cash account in

increments of $1 for every 100 Frequent Player Points (FPPs) that you earn by

playing paid contests. …. For more information about deposit bonuses, please click here." A screen shot of this page appears below.



(Last accessed October 9, 2015,

https://www.draftkings.com/account/depositnewvisitorinterstitial)

**FURTHER DOWN THE RABBIT HOLE, HOW FPPs "EARN" DEPOSIT MATCHING DOLLARS REMAINS INSCRUTABLE**

20.     This footnote does not explain what FPPs are; how the Player can earn FPPs; how frequently one must play to earn FPPs; how FPPs relate to the deposit bonus cash; how long it may take to earn FPPs; or how long Players have to earn them. Nor does it explain that the deposit bonus expires in four months.

21.     Even if the Player perseveres, reads the footnote, and clicks on the link for more information - despite the ticking countdown clock - the "more information" link leads not to an explanation of the FPP process, but only to a series of 63 Frequently Asked Questions on a wide range of topics that offers little or no help in deciphering the FPP/deposit bonus connection.

22.     There is no realistic way for a Player to enter the registration information, navigate through the FAQs, find the appropriate one, and correctly interpret it within the ten minutes provided.

23.     Even if he could, the FAQ responses shed scant light on the points process and deposit conditions. As shown below, the answer to the FAQ "How do I get my deposit bonus?" essentially repeats the unclear footnote on the deposit page, stating: "Deposit bonuses release in increments of $1 for every 100 Frequent Player Points (FPPs) that you earn by playing in paid contests."



(Last accessed October 9, 2015, https://www.draftkings.com/help/faq)

24.     The response to the FAQ then adds: "All deposit bonuses expire four months after they are created." This statement is similarly ambiguous; nowhere does it explain what it means for a deposit bonus to expire, or how to

determine when it is "created." A natural reading of the sentence would be that Players have four months to use their deposit bonus once it is "released" into their accounts. But in fact, what it apparently means is that Players have only four months to "earn" their bonus by accumulating FPPs before they can no longer receive the bonus that was promised to them when they signed up and deposited money.

25.     Another FAQ purports to answer the question, "What is a Frequent Player Point?," responding that "Frequent Player Points (FPPs) are points you earn upon the start of every paid contest you enter on DraftKings.com, whether you win or lose. FPPs awarded vary per contest type (displayed on the Draft page) and are not earned for paying FREE ENTRY games." Unhelpfully, the response posted below does not make clear at all how few points are awarded in most games, or how many games a Player would have to play – in four months - to earn enough points to get his full deposit bonus.



(Last accessed October 9, 2015, https://www.draftkings.com/help/faq)

26.     Nor does this statement explain that in stark contrast to the large type exclamation on previous pages urging Players to act quickly so that they can "double their cash," it is impossible for Players to double their initial cash without depositing and paying thousands more in entrance fees. Or that no additional "bonus" cash will be "already available to you."

**THE ACTUAL MATH IS DEPRESSING: PLAYERS MUST SPEND 25 TIMES THEIR INITIAL DEPOSIT TO EARN THEIR "FREE" DEPOSIT MATCH**

27.     In fact, in contrast to the website representations that if Players deposit "now, we'll **DOUBLE YOUR CASH**," or that depositing $25 will

result in a "free bonus" of $25 (rather than an opportunity to earn FPPs that *may* result in a bonus), the only way to get a full matching bonus is to spend 25 times that initial deposit on contest entry fees within four months. DraftKings never discloses before it accepts deposits how difficult it is to accumulate sufficient FPPs to get a full bonus. Its so-called "free" bonus is not free in any sense of the word—in fact it is exceedingly expensive.

28.     For example, a Player who deposited $100 would have to earn 10,000 FPPs to receive a full match of his initial $100 deposit. Doing so would require entering hundreds of contests, paying approximately $2,500 more in entrance fees – all within four months.

29.     Entry fees range from a low of $.25 to a high of $5,000, with many fees in the $3 to $5 range. If a Player entered a $5 contest, in exchange for his $5 fee he would earn 20 FPPs. At this rate, he would have to enter 500 contests, more than four a day for four months, and pay a total of $2,500 in entry fees, to earn his $100 "free" deposit bonus. This Player's ratio of deposit bonus dollars earned to entry fees paid is approximately 4%.

30.     A Player could hypothetically enter higher priced contests, and earn more points per contest, but the relative number of FPPs earned in the higher priced contests is actually lower. For example, a Player who pays $1,060 to enter an MLB contest earns only 2,400 FPPs, a ratio of approximately 2.3%, of deposit bonus dollars earned to entry fees paid.

31.     Not only does DraftKings fail to disclose these and other material conditions to obtaining the so called "free" deposit match, it affirmatively misrepresents that the deposit is automatic and immediate when it is anything but.

**FICTIONAL "PROMO CODES" DEPICTED IN INTERNET VIDEOS FURTHER MISLEAD PLAYERS**

32.     DraftKings' unfair and misleading representations saturate the Internet. YouTube is one of the many forums DraftKings has exploited to mislead the public and generate new business.

33.     One strategy DraftKings and its affiliated entities employ is offering special deals, like: (1) time sensitive "promo codes," (https://www.youtube.com/watch?v=OTH-OquOmFk, at 10 seconds and 35 seconds); and (2) "special" website access, like 'www.draftkingsdeal.com.' (https://www.youtube.com/watch?v=0Ozm3Mi-rPA, at 30 seconds). These marketing ploys are misleading—they are illusory because the "special deals" repeat DraftKings' normal policies regarding deposits. The illusory deals are intended to induce Players to join DraftKings under the false pretense that they are receiving a bargain others are not.

34.     These YouTube advertisements double down on DraftKings misleading matching deposit ploy. For example:

    a.   https://www.youtube.com/watch?v=0Ozm3Mi-rPA — "DraftKings offers a 100% bonus up to 600 dollars." (7–10 seconds). "As you can see, *your bonus will already be available to you. So if you deposit 600 dollars, you will get 600 dollars free bonus*. If you want to do something like 500

dollars, *you'll automatically get 500 dollars bonus*." (46 seconds to 1 minute).

b. https://www.youtube.com/watch?v=OTH-OquOmFk — "You're going to double your deposit, up to 600 dollars. *That means if you put in 100 bucks, you get 200 to play with*. Put in 300 and get 600. *Put in 600 and get 1200*." (40–53 seconds).

c. https://www.youtube.com/watch?v=SMLNxLpKd-4 —Large bold letters at the bottom of the YouTube clip appear at 16 seconds and remain on the screen for the remainder of the video.  The letters read: "Up to *$600 FREE* on Your First Deposit – Click Here!"

35.     But DraftKings' deposit bonus is neither "automatic," "already available to you," nor "free" since the Player must pay 25 times his initial deposit to receive the promised bonus, and do so before the four month bonus "window" expires. DraftKings' representations are not only misleading, but false.

### FACTS PERTINENT TO MR. WICKSMAN

36.     Nathan Wicksman joined DraftKings on September 13, 2015.

37.     On that date he deposited $100 into his DraftKings account, and based on the website representations, and other advertisements, was reasonably led to believe that his $100 would be doubled to $200 immediately.

38.     After he made his deposit, Mr. Wicksman discovered that in order to receive $100 in cash, he would have to pay roughly $4,000 in entrance fees based on the contests he was playing—all before his offer window closed on January 11, 2016.

39.     Mr. Wicksman has only received 1,556 FPPs since joining DraftKings, yielding him $15 in deposit bonuses. Mr. Wicksman would need to

"earn" a total of 10,000 FPPs before January 2016 to receive the $100 DraftKings promised him.

**DRAFTKINGS' OPPRESSIVE AND UNFAIR TERMS & CONDITIONS ATTEMPT TO ABROGATE BASIC LEGAL RIGHTS, AND CREATE AN ILLUSORY CONTRACT**

40.     Each prospective DraftKings Player must register and create a DraftKings account using the same steps and viewing the same screens as Mr. Wicksman. After completing this process, Players become "Authorized Account Holders."

41.     DraftKings requires Players to check a box agreeing to its "Terms of Use" in order to use the website. The "Terms of Use" are accessed by a hyperlink on the registration page, and are contained on eight pages of small, dense text. A copy of DraftKings' Terms of Use is attached as Exhibit A.

42.     DraftKings' Terms of Use contain a number of grossly one-sided provisions, which purport to contract away almost all conceivable legal obligations DraftKings would owe to the Players, while reserving to itself a number of draconian measures it can impose on the Players, and which it can invoke with virtually unfettered discretion.

**TOTAL DISCLAIMER OF LIABILITY**

43.     DraftKings disclaims liability for *any* wrongs it may commit. "Under no circumstances shall DraftKings be liable to you *for any loss or damages of any kind*… that are directly or indirectly related to the website, [or its] content…."

15

44.     DraftKings purports to absolve itself of *all liability* arising out of using its website or services to enter fantasy contests. Players hold DraftKings harmless and release it from any and all liability, claims or actions "*of any kind whatsoever…*" as well as any claims based on publicity rights, defamation, or invasion of privacy.

45.     This provision is particularly relevant to Players now, given that DraftKings has acknowledged that a DraftKings employee improperly and publicly released confidential Player submission data, and used that data to win hundreds of thousands of dollars on the site of DraftKings' chief rival, FanDuel.

46.     These are the Terms of Use that Players are ostensibly subject to by virtue of using the DraftKings website, regardless of the terms' one-sidedness, unconscionability and illegality, and the Players' lack of actual knowledge of and lack of affirmative assent to those terms.

**ILLEGAL LIMITATION OF REMEDIES**

47.     DraftKings purports to limit its total liability to Players for all damages to a maximum of $100.

48.     A Player's "sole and exclusive remedy" for any claims that DraftKings committed a legal wrong "is to discontinue accessing and using the website or the content." The terms and conditions purport to waive the right to seek an injunction, stating that any claim for "damages, losses or injuries … are not irreparable [or] sufficient to entitle to you to an injunction preventing any

exploitation of any website or other property owned or controlled by"

DraftKings.

49.     To lock in Players completely, DraftKings purports to have them

waive their rights entirely, DraftKings essentially disavows responsibility for any

obligation running to the Player: "By accessing the website, you understand that

you may be *waiving rights* with respect to claims that are this time *unknown or*

*unsuspected* (emphasis added).

**TOTAL DISCLAIMER OF WARRANTIES**

50.     DraftKings' complete disclaimer of warranties disavows virtually

every conceivable basis upon which a reasonable Player would rely in using the

website and DraftKings' services:

> All prizes are awarded as is and without warranty of any kind, express or
> implied, including without limitation any implied warranty of
> merchantability for particular purpose;

> DraftKings provides its website and services as is, as available and with
> all faults; DraftKings makes no representation or warranties *of any kind*
> *whatsoever* about the website content, products and services offered;

> DraftKings does not warrant that the Player's activities or use of the
> website are lawful;

> DraftKings specifically disclaims such warranties that the use of the
> website or the Player's activities are lawful. (Emphases added).

51.     DraftKings doesn't even warrant that its website and contests are

legal, rather, it puts the burden on the Player to ensure the legality of the contests

that DraftKings is charging a fee to play: "You understand that by using any of

the features of the website, *you acted your own risk*, and *you represent* that your

*activities are lawful*. Your access to and use of this website is *at your own risk*."

(Emphases added).

52.    But a Player would be unfairly surprised by that disclaimer, because DraftKings prominently touts the legality of its operation as "100% Legal."



(Last accessed October 9, 2015,

[https://www.draftkings.com/account/depositnewvisitorinterstitial](https://www.draftkings.com/account/depositnewvisitorinterstitial))

**UNFETTERED DISCRETION TO ALTER THE CONTRACT AND REVOKE PLAYERS' RIGHTS**

53.    DraftKings' Terms of Use purport to give it unfettered discretion to disqualify any Player, refuse to award prizes, require the return of any prizes or take any other action it deems appropriate if it deems a Player to have engaged in improper conduct.

54.    Ironically, improper conduct includes, but is not limited to "*any type of a bonus abuse*," the very claims being made against DraftKings in this lawsuit.

55.     DraftKings reserves the right to unilaterally change the terms of the agreement, without notice. "DraftKings reserves the right to amend these Terms of Use *at any time* and *without notice*, and it is *your responsibility* to review these Terms of Use for any changes. If you continue to use the Services after we change the Terms of Use, you accept all changes" (emphases added).

56.     And, "[i]n addition to any other … remedy,"DraftKings' can "without prior notice, immediately revoke any or all of your rights granted" under the contract.

**UNFETTERED DISCRETION TO EXPLOIT**

57.     DraftKings has unfettered use of winners' names, voices, and likenesses to serve its own promotional ends. "Winners agree that from the date of notification of the status as potential winner and continuing until "such time *when DraftKings informs them that they no longer need to do so* they will make themselves available to DraftKings for publicity, advertising, and promotion activities" (emphases added.)

58.     DraftKings even reserves the right to compel winners to sign a *liability/publicity release* as a condition of receiving the prize payments they have won. And the Player "will have no rights to enjoin or restrain advertising or exploitation of any company website or your upload information."

**NO REFUNDS ALLOWED**

59.     DraftKings Terms of Use contain a no refund policy: "All payments are final. No refunds will be issued."

**DRAFTKINGS' ARBITRATION PROVISION IS UNENFORCEABLE BECAUSE ITS UNFAIR AND DECEPTIVE PROVISIONS VIOLATE MASSACHUSETTS LAW**

60.     DraftKings' arbitration provision is hidden in its electronic agreement, and can be discovered only if a Player reads through 83 paragraphs of boilerplate legalese. It is the last provision in the agreement before "Miscellaneous." It is not clearly and conspicuously disclosed and is designed not to be noticed.

61.     Just as grossly one-sided as the other provisions in the "Terms of Use" which precede it, the arbitration provision purports to require Players to arbitrate "any and all disputes" with DraftKings except those filed in small claims court.

62.     DraftKings is a nationwide operation, but it unconscionably requires all arbitrations to be "held in Suffolk County, Massachusetts." This unfair venue requirement impairs the ability of Players who live in Massachusetts but at a distance from Boston to arbitrate their disputes, much less those who live in New York, Florida, or California, for example.

63.     The arbitration provision is unclear, because it also provides that "claims not subject to arbitration" will be litigated exclusively "in Suffolk County, Massachusetts." Not only is it unclear what claims are not subject to arbitration, but the same unfair venue requirement impairs the rights of those who choose to litigate their disputes with DraftKings.

64.     Further adding to the ambiguity, in direct contradiction to the arbitration clause, the paragraph that follows it provides that "Any claim or dispute between you and DraftKings that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a *court* of competent jurisdiction located in Suffolk County, Massachusetts" (emphasis added).

65.     And should a Player litigate when DraftKings thinks it should arbitrate, there is a fee shifting provision for challenging the arbitration requirement. Should the court decide that the issue is arbitrable, DraftKings claims entitlement to recover its attorneys' fees and costs.

66.     DraftKings' attempt to penalize any attempt by a Player to challenge its arbitration clause is designed to and does have a chilling effect upon consumers, and violates the public policy behind Massachusetts consumer protection laws, including Chapter 93A.

67.     Chapter 93A contains a fee shifting provision, awarding a successful consumer attorney's fees and costs. DraftKings' arbitration provision is an invalid attempt to negate that part of Chapter 93A, which only authorizes attorney fees and costs for a prevailing consumer, not for a prevailing defendant.

68.     DraftKings' loser pays provision, embedded in its arbitration clause, purports to invalidate the Legislature's intent in enacting Chapter 93A, and renders the arbitration clause unconscionable and unenforceable.

## CLASS ALLEGATIONS

69.    The class is composed of all persons in the United States who became DraftKings' "Authorized Account Holders" after DraftKings began offering any form of "deposit bonus" or other promotion advertising a doubling of the new Authorized Account Holder's deposit. The class excludes citizens of Arizona, Iowa, Montanta, Louisiana, and Washington.

70.    Based on the volume of DraftKings' Player' registrations, the prospective class numbers in the hundreds of thousands, making joinder of all members impracticable. The exact size of the proposed class and the identity of the class members are readily ascertainable from DraftKings' business records.

71.    There are questions of law and fact common to the class, which predominate over any questions affecting only individual class members. The principal common issues with respect to the class include: whether DraftKings' marketing is deceptive and misleading; whether its failure to provide matching deposits breaches its contracts with Players, or breaches its warranties; and whether these practices violate Chapter 93A.

72.    There are no difficulties likely to be encountered by the Court in the management of this proposed class action. There are no individual questions, other than those which can be determined by ministerial inspection of DraftKings' records, and the issues of liability are determinable entirely from the face of the operative documents.

73.     The Plaintiff's claims are typical of those of the class he seeks to represent, and he will fairly and adequately protect and represent the interests of the class. There is no conflict between Plaintiff and the proposed class.

74.     A class action is superior to other methods for the fair and efficient adjudication of this controversy. Because the damages suffered by the individual class members may be relatively small compared to the expense and burden of litigation, it would be impractical and economically unfeasible for class members to seek redress individually. In addition, it is likely that most class members are unaware that they have claims. Finally, the prosecution of separate actions by the individual class members, even if possible, would create a risk of inconsistent or varying adjudications with respect to the individual class members against DraftKings.

75.     Plaintiff is represented by counsel competent and experienced in both consumer protection and class action litigation.

## CAUSES OF ACTION

### COUNT I: BREACH OF CONTRACT

76.     DraftKings' website promises that in exchange for an immediate deposit, it will double the Player's cash, up to $600. Players who made such a deposit accepted this offer, creating a contract with DraftKings.

77.     DraftKings breached the contract with class members when it failed to immediately double class members' initial deposits.

78.     Class members were harmed by DraftKings' breach.

## COUNT II: UNJUST ENRICHMENT

79.     By accepting class members' initial deposits, then failing to double

them as promised, DraftKings was unjustly enriched.

80.     DraftKings accepted class members' deposits knowingly and with

awareness that it did so unjustly.

81.     Class members suffered a loss as a result of DraftKings' unjust

enrichment.

## COUNT III: BREACH OF EXPRESS WARRANTY

82.     DraftKings makes an express representation that it will double a

Player's deposit up to $600, in cash, immediately, and such representation goes

to the basis of the bargain it made with class members. DraftKings'

representation constitutes an express warranty.

83.     DraftKings breached its express warranty by failing to immediately

provide the promised deposits.

## COUNT IV: FALSE ADVERTISING IN VIOLATION OF MGL C. 266 § 91

84.     DraftKings used untrue, deceptive, and/or misleading

advertisements to sell its services, namely that a Player's initial deposit would be

doubled up to $600.

85.     Such advertisements were placed before the public, and were false.

86.     Class members were harmed by such false advertisements.

## COUNT V: VIOLATIONS OF CHAPTER 93A

87.     Plaintiff intends to assert a claim under G.L. c. 93A, which makes it unlawful to engage in any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." G.L. c. 93A, § 2(a). Plaintiff has made a demand in satisfaction of G.L. c. 93A, § 9(3), and will amend this Complaint to assert claims under Chapter 93A once the required 30 days have elapsed. This paragraph is included for purposes of notice only and is not intended to assert a claim under Chapter 93A. By way of notice, DraftKings' unfair and deceptive promises to double Players' deposits, and other associated practices, violate Chapter 93A. DraftKings violated the Attorney General's regulations including but not limited to: 940 C.M.R. 3.02, False Advertisement; 3.03, Deceptive Advertising of Guarantees; 3.04, Deceptive Pricing; 3.05, General Misrepresentations; 3.13, Pricing and Refund, Return and Cancellation Privileges; 3.16, General Provisions; and 6.08, Prizes.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all class members, requests that the Court enter judgment in their favor and against DraftKings, as follows:

A.      Certification of the proposed Class, including appointment of Plaintiff's counsel as Class Counsel;

B.      An order temporarily and permanently enjoining DraftKings from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.      Payment to class members equal to the amounts of their initial deposits;

D.      An order requiring DraftKings to pay both pre- and post-judgment interest on any amounts awarded;

E.      An award of costs and attorneys' fees; and

F.      Such other or further relief as may be appropriate.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

DATED: October 13, 2015

Respectfully submitted,

*/s/ John Roddy*
John Roddy (BBO No. 424240)
Elizabeth Ryan (BBO No. 549632)
Bailey & Glasser LLP
99 High Street, Suite 304
Boston, MA 02110
(617) 439-6730 (phone)
(617) 951-3954 (fax)
jroddy@baileyglasser.com
eryan@baileyglasser.com